**In the Matter of Clarence Edward McREYNOLDS, Martha Lu McReynolds, Debtors.**

**No. 99–04344–CJ.**

United States Bankruptcy Court, S.D. Iowa.

June 9, 2000.

---

Mike Christensen, Des Moines, IA, for Debtors.

Barbara G. Stuart, Office of the U.S. Trustee, Des Moines, IA, U.S. Trustee for Region 12.

## MEMORANDUM OF DECISION

LEE M. JACKWIG, Bankruptcy Judge.

Barbara G. Stuart, the United States Trustee for Region 12 ("U.S. Trustee"), filed an 11 U.S.C. section 707(b) motion to dismiss this Chapter 7 case. She contends Debtors Clarence Edward and Martha Lu McReynolds ("Debtors") have the ability to pay a significant percentage of their consumer debt and, therefore, permitting them to proceed with this liquidation case would be a substantial abuse of the provisions governing Chapter 7. The Debtors disagree. Having conducted an evidentiary hearing on the controversy and having reviewed the record and the arguments of the parties, the Court now enters its decision.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. section 1334 and the standing order of reference entered by the U.S. District Court for the Southern District of Iowa. This is a core matter under 28 U.S.C. section 157(b)(2)(A) and (O).

## BACKGROUND

On November 16, 1999 the Debtors filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. On the same date they filed their Schedules and Statement of Financial Affairs. On Schedule D (Creditors Holding Secured Claims), the Debtors indicated they owed $159,937.56 in secured debt, on Schedule E (Creditors Holding Unsecured Priority Claims), they reported $3,560.00 in unsecured priority debt, and on Schedule F (Creditors Holding Unsecured Nonpriority

Claims), they listed $57,039.05 in unsecured nonpriority debt.[1]

On Schedule I (Current Income of Individual Debtors), they reported that Mr. McReynolds had been employed as a Postal Clerk with the U.S. Post Office for 20 years and Mrs. McReynolds had been employed as a Real Estate Agent with Iowa Realty for 14 years. His monthly gross income was $5,833.00 and hers was $1,250.00. After all deductions and adjustments were taken into account, his net monthly income was $3,635.00 and hers was $1,020.00. Their combined net monthly income was $4,655.00. Regarding Mr. McReynolds' income, the Debtors added the following cautionary notation to the bottom of Schedule I: "Currently, the Debtor receives anywhere from 6 to 36 hours overtime per payperiod. This is figured in the above monthly income, however, his overtime will decrease considerably with the hiring of additional workers."

On Schedule J (Current Expenditure of Individual Debtors), the Debtors indicated their total monthly expenses amounted to $4,988.00. That figure included payments on their secured and unsecured priority debts. In addition to various personal and household expenses, the Debtors reported $401.00 in business expenses for Mrs. McReynolds. In a statement attached to Schedule J, they set forth the following itemization: Business cell phone ($150.00); Multiple dues ($140.00); Lock boxes, signs, etc. ($75.00); Agent license ($27.00); and Continuing education ($9.00).

On February 3, 2000 the U.S. Trustee filed the pending motion to dismiss, in which she alleged the Debtors understated Mr. McReynolds' net monthly income and overstated some of their expenses. Based on Mr. McReynolds' bi-weekly wage statement for pay period # 21, the U.S. Trustee calculated his average monthly gross income at $5,635.92—a gross amount less

than that reported on Schedule I. Nevertheless, the U.S. Trustee maintains the Debtors understated Mr. McReynolds' net monthly income by deducting voluntary contributions to a retirement plan and, therefore, his average net monthly income should be $3,734.86—a net amount greater than that reported on Schedule I.

As for the Debtors' monthly expenses, the U.S. Trustee reduced the amounts shown on Schedule J for electricity, telephone, cable, food, clothing, medical, transportation, auto insurance, and auto installments on two vehicles. She eliminated expenses for life insurance and the unsecured priority tax debt.

According to the U.S. Trustee's adjusted calculations, the Debtors' combined net monthly income was $4,755.00[2] and their monthly expenses totaled $3,604.00. She contended the resulting disposable monthly income of $1,151.00 would pay off 68.38% of Debtors' unsecured priority and unsecured nonpriority debts in three years and 113.96% in five years.

On February 15, 2000 the Debtors filed their objection and attached a number of exhibits, including informal amendments to Schedules I and J. The Debtors changed Mr. McReynolds' monthly gross income to $3,292.92. At the bottom of revised Schedule I, they stated: "Income based on annual base salary of $39,515 with no overtime." They no longer deducted the voluntary contributions to Mr. McReynolds' retirement plan. In sum, they represented his net monthly income as $2,005.00 and their total combined net monthly income as $3,025.00.

As for the challenged expenses, the Debtors reduced their original amounts in seven categories, left three unchanged, and increased two. They changed laundry and dry cleaning from $0.00 to $96.00. They also increased Mrs. McReynolds' business expenses to $498.70. In an attached state-

---

1. The parties do not dispute the Debtors' debts are primarily consumer debts.

2. For the purpose of the final calculations, the U.S. Trustee rounded off her net monthly income figure of $4,754.86.

ment, they set forth the following new itemization: Business cell phone ($122.75); AOL internet service ($21.95); Multiple dues ($150.00); Lock boxes, signs ($75.00); Advertising ($45.00); Agent license ($27.00); Continuing education ($9.00); Business mailings ($18.00); E & O Insurance ($5.00) and Miscellaneous business expenses ($25.00). These various adjustments reduced their monthly expenses to $4,749.70.

The Court conducted a preliminary telephonic hearing on the controversy on February 29, 2000 and an evidentiary courtroom hearing on May 5, 2000. The U.S. Trustee relied on Exhibits A (Calculation of Income) and B (Monthly Expenses, Disposable Monthly Income, and Repayment Capacity) that were attached to her motion to dismiss. The Debtors offered and the Court received Exhibits 1 through 13. The U.S. Trustee called three witnesses: L. Todd Vandenberg, who is the U.S. Trustee's Bankruptcy Analyst for the Southern District of Iowa, and the Debtors.

Mr. Vandenberg testified that Debtors' Exhibit 3, consisting of eight consecutive wage statements from the beginning of this year, reflected an average bi-weekly gross income of $2,723.12. That amount multiplied by 26 pay periods generated an annual gross income of $70,801.12 or a monthly gross income of $5,900.09. He pointed out those wage statements not only supported but exceeded the gross income calculation he had prepared for Exhibit A. Additionally, Exhibit 13 contained Debtors' federal and state income tax returns for 1999. On those returns, the Debtors reported that Mr. McReynolds' earned $68,684.00, a figure that also exceeded the U.S. Trustee's income projection. As for Mrs. McReynolds' 1999 income, the Debtors reported her business expenses of $16,603.00 exceeded her gross sales of $15,873.00 for a business loss of $730.00.

On cross-examination, Mr. Vandenberg acknowledged his direct testimony regard-

ing Exhibit 3 did not exclude the 80 hours of vacation pay Mr. McReynolds sold to his employer for $1,536.66 additional income during the second pay period of this year. However, as reflected by Exhibit 13, he noted the Debtors' 1999 federal and state tax refunds totaled approximately $7,400.00. Though the Internal Revenue Service offset its $3,517.85 unsecured priority claim from the federal refund, the Debtors received the balance. Neither his calculations for the motion to dismiss nor his testimony on direct included that additional income.

Mr. Vandenberg also admitted he did not take into consideration the statement found at the bottom of Schedule I, as filed on the petition date. Nor did he take into account Debtors' Exhibit 2, a copy of a note that was typed on a piece of paper with no letterhead and that read as follows:

To Whom it may concern,

Mr. Mc Reynolds has asked me to write an explanation as to why the overtime in his work area has diminished lately. In fact, the new automation the U.S. Postal Service has implemented, has caused a reduction in work hours for their employees as far as overtime is concerned. Eventually, the Postal Service hopes to eliminate all overtime by means of automation.

Sincerely,

Patricia A. Zeroni

Supr. Distr Opertions [sic]

US Postal Service

Exhibit 2 was signed and hand dated "2–14–00."

Mr. Vandenberg also testified regarding the various expense adjustments on Exhibit B. In general, he explained that the U.S. Trustee's recommendations were based on standard guidelines for a family of two living in this district. With respect to various specific line items, he observed the Debtors either did not provide any documentation verifying a monthly expen-

diture or they did not offer convincing evidence supporting an increase over the standard guideline for that expenditure.

Mrs. McReynolds, aged 50, testified that her real estate work had been "doing well" in 1998. She cited surgery on both her knees in 1999 as the reason for the decline in her income last year. She described her continued exercise regimen at 7 Flags Fitness & Racquet Club, an expense not mentioned before and not documented in the record before the Court. Her testimony suggested her physical condition continues to impair her ability to earn as much as she did in 1998. As of the date of the evidentiary hearing, she had generated $5,000.00 gross income from two sales for the year. She explained that the downturn in her earnings, coupled with learning her husband's overtime would be curtailed, contributed to the Debtors' decision to seek relief under Chapter 7.

Mrs. McReynolds also testified that various amounts set forth on the informal amendment to Schedule J, found on page 2 of Exhibit 4, were monthly averages based on what the Debtors actually spent for such items over a number of months. She believed the Debtors' documentation, found in some of the other exhibits, generally supported the amount and reasonableness of those figures. As for business expenses, Mrs. McReynolds stated she received no reimbursement from Iowa Realty.

Mr. McReynolds, aged 56, testified that the U.S. Post Office had been reducing the amount of overtime available for his position as a postal clerk. Whereas he had worked twenty hours a week overtime in 1999, Mr. McReynolds stated he was now working at most between six and eight hours a week overtime. He acknowledged that historically the amount of overtime varies depending upon the time of year. Though he must take medication for his diabetes and high blood pressure, Mr. McReynolds did not believe those conditions did have or would have any impact on his job performance.

## APPLICABLE LAW

▉ 11 U.S.C. section 707(b) provides in relevant part:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. section 707(b). The Eighth Circuit substantial abuse inquiry focuses primarily on an individual debtor's ability to pay his or her debts. *See In re Koch,* 109 F.3d 1285, 1288 (8th Cir.1997); *U.S. Trustee v. Harris,* 960 F.2d 74, 77 (8th Cir. 1992); *Fonder v. United States,* 974 F.2d 996, 999 (8th Cir.1992); *In re Walton,* 866 F.2d 981, 984–85 (8th Cir.1989). The ability to pay is typically measured by assessing how much disposable income a debtor would be able to pay his or her unsecured creditors under a three to five year Chapter 13 plan. *See Koch,* 109 F.3d at 1288. 11 U.S.C. section 1325(b)(2) defines "disposable income" as follows:

> "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor ... and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2). The controlling circuit case law does not require a trial court to find a debtor can pay a specific threshold of unsecured debt over three to five years before that court may conclude the Chapter 7 filing amounts to substantial

abuse. Rather, "the essential inquiry remains whether the debtor's ability to repay creditors with future income is sufficient to make the Chapter 7 liquidating bankruptcy a substantial abuse of the Code." *Fonder*, 974 F.2d at 999.

Finally, neither section 707(b) nor its legislative history suggest Federal Rule of Evidence 301 would not apply in this case.[3] Accordingly, a U.S. Trustee has the burden of rebutting or meeting the section's presumption in favor of a debtor. Nevertheless, a debtor must file a schedule of current income and current expenditures in support of the Chapter 7 petition. 11 U.S.C. § 521(1). Those schedules must be accurate. Fed. R. Bankr.P. 1008.[4]

## DISCUSSION

Resolution of the pending controversy first requires the Court to determine how much disposable income the Debtors will likely have in the next three to five years. Then the Court must decide whether allowing the debtors to retain that amount in lieu of paying their unsecured debts is a substantial abuse of the Chapter 7 provisions.

## I. The Disposable Income Calculation.

The parties dispute how much Mr. McReynolds will earn over the next three to five years and whether certain of the Debtors' expenses are accurate and reasonable.

## *Monthly Income*

The U.S. Trustee contends the record supports finding Mr. McReynolds' earning capacity is at least as high as the $5,635.92 average monthly gross income figure set forth on Exhibit A. The Debtors maintain the U.S. Trustee has failed to take into account any decrease in overtime hours. Accordingly, they argue the $3,292.92 average monthly gross income figure set forth on page one of Exhibit 4 is more accurate.[5]

The record supports the U.S. Trustee's position. Indeed, at least on their face, Mr. McReynolds' first eight wage statements for this year and his 1999 tax returns are generally consistent with the U.S. Trustee's projection. Though it is true that the first wage statement for 2000 likely contains overtime hours related to the busy holiday season in December 1999 and that may have made Mr. Vandenberg's calculations for the coming year high at the time of the hearing, one must remember that the witness based the $5,635.92 figure on 1999 pay period # 21. Nothing in the record suggests that would have covered a particularly busy time of year for the U.S. Postal Service.[6]

---

**3.** Federal Rule of Evidence 301, made applicable to bankruptcy cases and proceedings by Federal Rule of Bankruptcy Procedure 9017, provides:

In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. Fed.R.Evid. 301.

**4.** Federal Rule of Bankruptcy Procedure 1008 provides that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."

**5.** The Debtors did not formally amend their Schedules I and J, perhaps due to some confusion at the time of the preliminary hearing. Given that the Debtors' sworn testimony relied on the informal amendments contained in Exhibit 4, that a concern regarding overtime was noted on both versions of Schedule I, and that the informal amendment to Schedule J decreased at least some of their expenses and the sum of those expenses, the Court will treat the documents in Exhibit 4 as though they had been verified pursuant to Federal Rule of Bankruptcy Procedure 1008.

**6.** Assuming the U.S. Postal Service utilized a pay schedule similar to the one the federal judiciary used last year, the pay period in question would have extended from September 27, 1999 to October 10, 1999.

As for the Debtors' position, the Court does not doubt their sincere belief that significantly less overtime will be available for Mr. McReynolds. Nevertheless, the record does not support finding their projection will more likely than not prove to be an accurate one. That is, nothing in the record supports their first representation that overtime would be very limited because the U.S. Postal Service would be hiring more workers. Only Exhibit 2 might support their later representation that future overtime will be curtailed because of the new automation Mr. McReynolds' employer is implementing. However, the Court does not give Exhibit 2 much weight. The note is simply too vague in its references to both past and future decreases in overtime. It does not assist the Court in determining how much, if any, of the fluctuation seen in the first eight wage statements is due to automation as opposed to seasonal trends. Nor does it assist the Court in determining if and when overtime will be eliminated during the next five years.

Therefore, the Court adopts the U.S. Trustee's projection regarding Mr. McReynolds' average monthly gross income. Since the parties no longer disagree about any of the deductions related to Mr. McReynolds' income and they have no dispute regarding Mrs. McReynolds' income, the Court finds the Debtors' combined net monthly income to be the $4,754.86 figure reflected on Exhibit A.

### Monthly Expenses

*Electricity.* As reflected by the attached chart, the Debtors have voluntarily reduced this expense item to the amount recommended by the U.S. Trustee.

*Telephone.* The U.S. Trustee recommends $75.00. The Debtors request $117.00.

Debtors' Exhibit 5 contains their monthly bills and cancelled checks for services from June through October 1999. Those bills range from $112.02 to 127.83 and average $118.00.[7] The Debtors maintain the $42.00 difference between their request and the U.S. Trustee's recommendation is reasonable because this line item includes a voice and a fax line for Mrs. McReynolds' work as a real estate agent. The Debtors do not explain why those costs were not included in the business expense itemization rather than being lumped together with the amount expended for personal use. Nevertheless, page 11 of Exhibit 13 contains various business expenses, including "Voice Mail" at $105.00 and "Addl Line, Long Distance Chgs" at $445.00, that Mrs. McReynolds listed in support of the Debtors' 1999 federal tax return. Since the sum of those two annual expenses would average $45.83 monthly, the Court will allow a monthly telephone expense of $117.00.

*Cable.* The U.S. Trustee recommends $25.00. The Debtors request $28.00.

The Debtors provided no documentation in support of their request. The Court will allow $25.00.

*Food.* The U.S. Trustee recommends $300.00. The Debtors request $366.00.

Debtors' Exhibit 6 contains canceled checks representing payments made to local grocery stores from June through October 1999. The documentation reveals that the Debtors' total monthly grocery bills range from $224.23 to $454.11 and average $366.35. The Debtors maintain the $66.00 difference between their request and the U.S. Trustee's recommendation is reasonable because they both have specific dietary needs. Mrs. McReynolds consumes a special diet drink to help her keep her weight down and, in turn, reduce stress on her knees. Mr. McReynolds must watch his high blood pressure, diabe-

---

**7.** The Court's addition and division differs from some of the Debtors' various expense calculations but only slightly in most instanc-

es. Rather than expend more words on those discrepancies, the Court accepts the Debtors' figures for the purpose of this discussion.

tes, and cholesterol levels. Though the U.S. Trustee's recommendation tracks with rulings by both bankruptcy judges in this district, the standard allowance is subject to adjustment both for general price trends and for particular circumstances. Accordingly, the Court will allow a food expense of $366.00.

*Clothing.* The U.S. Trustee recommends $50.00. The Debtors request $175.00.

■ Debtors' Exhibit 7 contains canceled checks representing payments made to local department and discount stores from June through October 1999. The documentation reveals that the Debtors' total monthly clothing bills range from $86.05 to $368.93 and average $176.42. The Debtors maintain the $125.00 difference between their request and the U.S. Trustee's recommendation is reasonable because Mrs. McReynolds' circumstances do not fit the U.S. Trustee's guidelines for an adult who has an established wardrobe requiring only enough funds to repair or replace worn items. That is, they contend Mrs. McReynolds' weight fluctuations require two wardrobes suitable for her line of work and she must buy quality shoes to accommodate her post-surgery condition.

Mrs. McReynolds, however, did not explain why she would need an additional $125.00 per month or $1,500.00 per year to maintain two wardrobes. Less wear should mean less tear. Mrs. McReynolds' testimony did not suggest that the shoes she buys are specially made or prescribed for medical reasons. She did not explain why shoe repair would not extend the life of the quality shoes she buys. Though the court agrees her work may warrant an increase in the U.S. Trustee's standard clothing recommendation, the Court does not believe the amount requested is reasonable. The Court will allow a clothing expense of $100.00.

■ *Laundry and Dry Cleaning.* The U.S. Trustee did not make a recommendation regarding this item because the Debt-

ors did not list an amount on Schedule I. The Debtors now request $96.00.

Debtors' Exhibit 7 also contains canceled checks representing payments made to a local dry cleaner from June through October 1999. Those checks range from $53.35 to $138.69 and average $96.41. The Court observes that Debtors' request greatly exceeds what most Chapter 13 debtors budget for this line item. The Court recognizes that Mrs. McReynolds' business attire may require dry cleaning on a regular basis and that, in turn, may justify the need for some increase over the norm. Nevertheless, to the extent the required amount is entirely for "dry clean only" attire, the Debtors should consider looking for a dry cleaner that charges less or dry clean somewhat less often. To the extent the amount is for washable items, the Debtors should launder those items at home or at a coin operated laundry service. The Court will allow a combined laundry and dry cleaning expense of $50.00.

*Medical.* At the conclusion of the evidentiary hearing, the U.S. Trustee withdrew her objection to the Debtors' request for $200.00. The record supports a finding that such amount is reasonable given the Debtors' medical conditions.

*Transportation.* The U.S. Trustee recommends $150.00. The Debtors request $175.00.

■ Debtors' Exhibit 9 contains canceled checks for maintenance, repair and fuel expenses for their two vehicles from June through October 1999. Mr. McReynolds drives a 1995 Ford Ranger and Mrs. McReynolds drives a 1999 Ford Taurus. The maintenance and repair expenses range from $41.55 to $251.05 and average $114.05. The fuel expenses range from $36.52 to $101.58 and average $65.03. However, some of those expenses are attributable to the leased 1998 Cadillac Mrs.

McReynolds was driving at the time.[8] Also, many of the maintenance expenses are for services at Washpointe. To the extent the charges are for exterior washes and interior cleanings, the Debtors should be able to accomplish the same aesthetic maintenance more economically by washing their vehicles at home or at a coin-operated car wash throughout much of the year. Finally, the Debtors also include $91.00 for car registration even though Schedule J includes a separate uncontested $25.00 allowance for "Auto license." Accordingly, the Court finds the U.S. Trustee's recommendation to be more reasonable than the Debtors' request and will allow a transportation expense of $150.00.

*Life Insurance.* The U.S. Trustee recommends nothing be allowed for this line item. The Debtors request $180.00.

■ Exhibit 10 contains information regarding the Debtors' two life insurance policies. Mr. McReynolds' Federal Employees' Group Life Insurance Program requires a monthly deduction of $134.33. Mrs. McReynolds' policy with Principal Life Insurance Company requires a monthly premium of $45.03. The Debtors argue continuation of these policies is reasonable because their poor health would prevent them from securing other insurance and, if one of them died, the other would be left with nothing. They thought the policies had no cash value.

The Court finds these arguments unpersuasive. According to page 1 of Exhibit 10, Mrs. McReynolds' policy has a cash value (after subtracting money loaned against the policy) of $440.00 and lists her adult daughter as primary beneficiary. Mr. McReynolds is the contingent beneficiary. Moreover, as the record indicates, each Debtor is employed and should have the ability to support himself or herself in the event the other should die. Therefore,

the Court finds life insurance is not a reasonable expense in this case.

*Auto Insurance.* The Trustee recommends $100.00. The Debtors request $177.00.

■ Exhibit 11 contains information about the Debtors' policy with Allied Group Insurance. The Debtors' monthly minimum payment is $177.03. The deductible is $500.00. Mrs. McReynolds testified the policy covers both Debtors and their two vehicles. Though neither Debtor indicated whether they had shopped for insurance requiring a lower premium, Mrs. McReynolds did explain her insurance costs are high due to two traffic tickets and a 1995 accident. Accordingly, the Court finds the Debtors' request is reasonable and will allow an auto insurance expense of $177.00.

*Taxes.* Since the Internal Revenue Service set off the Debtors' scheduled tax debt against their 1999 federal refund, the Debtors no longer need any allowance for this line item.

*Auto Installments.* The U.S. Trustee recommends $300.00 per vehicle. The Debtors request $365.00 for the 1995 Ford Ranger and $471.00 for the 1999 Ford Taurus.

■ Debtors' Exhibit 12 contains canceled checks representing Mr. McReynolds' payments on the Ranger in the amount of $365.53 and Mrs. McReynolds' payments on the Taurus in the amount of $472.24. The Debtors maintain the $65.00 difference and the $171.00 difference between their requests and the U.S. Trustee's recommendations are reasonable despite the U.S. Trustee's contention they could find replacement vehicles for less money.

---

**8.** On Schedule G (Executory Contracts and Unexpired Leases), the Debtors rejected the GMAC Smart Lease. On December 28, 1999 the Court granted GMAC relief from the automatic stay to obtain possession of its collateral. At the time of the evidentiary hearing, Mrs. McReynolds testified the creditor had not yet removed the vehicle from the Debtors' property. She, however, no longer drives that car.

With respect to the 1995 Ranger, the U.S. Trustee's argument is not clear to the Court. With respect to the 1999 Taurus, the U.S. Trustee's argument is not persuasive. Though Mrs. McReynolds purchased the new car shortly before seeking relief in this forum, the current monthly payment on the Taurus is considerably less than the former $935.00 monthly lease payment on the Cadillac. Moreover, Mrs. McReynolds testified she obtained a very low interest rate on the 1999 Taurus. The Debtors suggest the monthly payment on a less expensive used vehicle would have been the same as her payment on the Taurus because the interest rate on the used vehicle would have been much higher. Mrs. McReynolds also speculated that her status as a bankruptcy debtor might make financing another car at this point cost prohibitive. On balance, the Court agrees with the Debtors' reasoning and will allow auto installment expenses of $365.00 and $471.00.

Parenthetically, the Court points out Mrs. McReynolds testified Mr. McReynolds would pay off the Ranger loan in another year. Hence, thereafter at least a portion of the $365.00 would be considered disposable income in a Chapter 13 setting unless the full amount was necessary for maintenance, above the amount allowed for transportation expenses, or was necessary for the purchase of a replacement vehicle.

*Business expenses.* The U.S. Trustee recommends $401.00, the amount Debtors originally set forth on Schedule J. The Debtors now request $498.70. The U.S. Trustee did not take issue with that increase at the time of the evidentiary hearing and neither will the Court. Information regarding business expenses found in Exhibit 13, the Debtors' 1999 tax returns, generally supports the Debtors' request. The Court will allow a business expense of $499.00.

█ The Debtors also add at the bottom of the business expense itemization on page 4 of Exhibit 4: "Business expense for client entertainment (dining) has not been included in this amount, i.e., $175 approximately." Debtors' Exhibit 6 does contain some receipts from various restaurants in the area from June through October 1999. The documentation reveals expenditures ranged from $84.99 to $380.34 and averaged $222.80. However, paragraph 8(d) of their objection to the motion to dismiss suggests those expenses might be related to personal rather than business dining. Moreover, Mrs. McReynolds listed $1,885.00 for business meals and entertainment on Page 5 of Exhibit 13, the Schedule C she filed as part of the Debtors' 1999 federal tax return. That amount yields a monthly average of $157.08. It is not clear what portion of that amount is limited to meals.

Mrs. McReynolds' testimony addressed neither the reasonableness of the business dining expense in general nor the amount requested in particular. Nevertheless, the Court again notes that the U.S. Trustee did not take issue with this expense item at the time of the hearing. The Court also realizes that occasionally it may behoove a real estate agent to pick up a client's tab for light refreshments during an extended session of visiting potential properties. Accordingly, the Court will allow a business dining expense of $125.00.

*Monthly Balance*

The sum of the allowed monthly expenses is $4,448.00. Subtracting that amount from the rounded off monthly income figure of $4,755.00 yields monthly disposable income of $307.00.

II. The Substantial Abuse Analysis.

█ Based on the above calculations, the Debtors will likely have between $11,052.00 and $18,420.00 disposable income over the next three to five years.[9] Since their projected expenses include payments on their scheduled secured debt

9. $307.00 × 36 = $11,052.00 and $307.00 × 60 = $18,420.00.

and since their scheduled priority unsecured debt has been satisfied, the disposable income they would generate over the next three to five years would be available to satisfy between 19.38% and 32.29% of their scheduled unsecured nonpriority debt.[10]

Moreover, the 1999 post-setoff federal tax refund, the 1999 state tax refund, and any tax refunds over the next three to five years would be additional disposable income that would raise the percentage of debt repayment.[11] Likewise, the remaining cash value of Mrs. McReynolds' life insurance policy and deletion of some or all of the car installment expense for Mr. McReynolds' Ranger a year from now would further increase that percentage.

Finally, in this substantial abuse analysis, the Court must consider the ramifications of Mrs. McReynolds' work as a real estate agent. On the one hand, the Debtors' disposable income would rise significantly if her income returns to the 1998 level.[12] On the other hand, the Debtors will continue to benefit from certain above standard allowed expenses even if her income remains at the 1999 level.[13] That benefit would be at the expense of the unsecured nonpriority creditors if the Court permitted the Debtors to proceed with this Chapter 7 case.[14]

## CONCLUSION

WHEREFORE, the Court finds that the U.S. Trustee has overcome the statutory presumption in favor of granting Chapter 7 relief and, therefore, the motion to dismiss must be granted.

A separate Order shall be entered accordingly.

**MONTHLY EXPENSES (In Whole Dollars)**

| ITEM | SCHEDULE J | EXHIBIT B | EXHIBIT 4 | ALLOWED |
|---|---|---|---|---|
| Home Mortgage | 771 | 771 | 771 | 771 |
| Electricity | 300 | 150 | 150 | 150 |
| Water/Sewer | 25 | 25 | 25 | 25 |
| Telephone | 150 | 75 | 117 | 117 |

10. [$11,052.00 × 100] ÷ $57,039.00 = 19.38% and [$18,420.00 × 100] ÷ $57,039.00 = 32.29%. Parenthetically, the Court points out these calculations do not take into account either the trustee's commission and the attorney's fee in a Chapter 13 context or the accrual of interest under a repayment plan outside of bankruptcy.

11. Pages 1, 2, 14 and 15 of Exhibit 13 reveal the Debtors' total refunds exceeded $5,200.00 in 1998 and exceeded $7,400.00 in 1999. While only approximately $3,900.00 of the 1999 total refunds are properly considered disposable income available to pay the scheduled unsecured nonpriority debt, the two year history of large refunds cannot be overlooked.

12. According to Paragraph 1 of the Debtors' Statement of Financial Affairs, Mrs. McReynolds earned $34,465.00 from her work as a real estate agent in 1998.

13. In closing argument, Debtors' attorney also contended that Mrs. McReynolds' income should not be considered because she was operating her business at a loss. However, if one were to subtract Mrs. McReynolds' $1020.00 net monthly income from the Debtors' monthly disposable income, one would also be required to add back both her monthly business expenses and the related increased expenses the Court allowed because of her work. Those adjustments would include: $499.00 for general business expenses; $125.00 for business dining; $42.00 for telephone; $50.00 for clothing; approximately $15.00 for dry cleaning and laundry; and a significant portion of the various costs associated with driving the Taurus.

14. The Court file reflects this is a no asset case, meaning there will be no distribution for unsecured creditors. The file also reflects that no creditor timely brought a complaint to determine dischargeability of its debt or an objection to the general discharge of all debts, meaning granting a Chapter 7 discharge in this case will extinguish the scheduled unsecured nonpriority debt.